UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| Respondent, | ) | CRIMINAL ACTION NO. |
| | ) | 95-10234-DPW |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 12-11431-DPW |
| FRANCIS H. WOODWARD, | ) | |
| | ) | |
| Petitioner. | ) | |

MEMORANDUM AND ORDER
October 10, 2012

Francis H. Woodward seeks a writ of error coram nobis pursuant to the All Writs Act, 28 U.S.C. § 1651, in an effort to vacate and expunge his 1997 convictions for honest services mail and wire fraud.  He bases his petition on the Supreme Court's decision in *Skilling* v. *United States*, 130 S. Ct. 2896 (2010), handed down over thirteen years after the original judgment of conviction entered.

## I. BACKGROUND

### A.   *Factual Background*

I recite the facts relevant to my analysis here, drawing on several other opinions that have already comprehensively detailed the circumstances of the scheme leading to Woodward's prosecution and conviction.  *See United States* v. *Woodward*, 149 F.3d 46, 51-54 (1st Cir. 1998) (affirming Woodward's conviction on direct

appeal); *United States* v. *Sawyer* ("*Sawyer I*"), 85 F.3d 713, 720-22 (1st Cir. 1996) (vacating and remanding conviction of Woodward's co-conspirator); *United States* v. *Sawyer* ("*Sawyer II*"), 239 F.3d 31, 35-36 (1st Cir. 2001) (vacating writ of coram nobis that had, in turn, vacated guilty plea entered after remand in *Sawyer I*).

Woodward was a member of the Massachusetts House of Representatives from January 1977 until April 1992, serving as House Chair of the Joint Committee on Insurance from January 1985 through January 1991.  From 1984 through 1992, Woodward received at least $8,740 in payments--in the form of meals, rounds of golf, and other entertainment--from William Sawyer, a lobbyist for John Hancock Mutual Life Insurance Company, one of the two largest insurance companies in Massachusetts.  Although Woodward claimed he and Sawyer were merely close friends, the payments "were not mutual but rather operated in one direction only.  The standard operating procedure was for Sawyer to pay for meals, drinks and golf for Woodward; Woodward did not make similar payments for Sawyer."  *Woodward*, 149 F.3d at 58.

The First Circuit summarized the suspicious pattern of these payments:

> In 1984 and 1985, before Woodward became chair of the Committee and for the first year afterward, Woodward accepted gratuities in the range of $200-300 from Sawyer/Hancock. In 1986 there was a marked increase to $2,527, including over $1,800 to cover the air fare, hotel, and tickets (for him and his wife) to attend the Super Bowl

in New Orleans. In 1987-91, Woodward received gratuities in the amount of $1,547, $1,093, $5133, $1,230, and $1,324. Woodward served as committee chair during all but the last of these years. During his last four months in the legislature, January through April 1992, he received only $16, and his gratuities dropped to $0 after he resigned from office in April. After Woodward was replaced as committee chair by Rep. Francis Mara, Sawyer began wining and dining Mara in the same manner as he had Woodward.

*United States* v. *Woodward*, 149 F.3d 46, 53 (1st Cir. 1998).

Sawyer's payments to Woodward were paralleled by results. Woodward regularly and actively supported the insurance industry's positions on bills of importance.  Over the course of Woodward's tenure, the legislature considered about 600 bills of interest to the life insurance industry; Woodward opposed the industry's position on only thirty-one of those bills, most of which related to mandated health insurance benefits of less importance to the life insurance industry.  *Woodward*, 149 F.3d at 61.  According to Robert J. Smith, research director for the Insurance Committee, "Woodward was the most pro-life-insurance-industry chair of the Insurance Committee during Smith's tenure, 1985-95 (which included six other House and Senate chairs)."  *Woodward*, 149 F.3d at 52.

Meanwhile, Woodward failed to disclose the payments he received from Sawyer on his Statements of Financial Interest, as was required by Mass. Gen. Laws ch. 268B, § 5.  *See Woodward*, 149 F.3d at 62-63.  Woodward himself called his failure to comply with the Massachusetts reporting statute "reprehensible."  *Id.* at

-3-

62.

## B.   *Procedural History*

Woodward was charged in a 28-count indictment in 1995.  In October 1996, he was convicted after trial on five counts:  one count each of honest services mail and wire fraud, 18 U.S.C. §§ 1341, 1343 (Counts 4 and 9); two counts of interstate travel to commit bribery under the Travel Act, 18 U.S.C. § 1952 (Counts 14 and 24); and conspiracy to commit these offenses, 18 U.S.C. § 371 (count 1).

Following the verdict, I granted judgment of acquittal on Count 24, as duplicitous.  The First Circuit affirmed Woodward's remaining convictions.  *United States* v. *Woodward*, 149 F.3d 46 (1st Cir. 1998).  In a collateral attack under 28 U.S.C. § 2255, after the convictions became final but before Woodward began serving his sentence, I vacated and dismissed the convictions on Counts 1 and 14 based on intervening interpretations of the federal and state gratuity statutes in *United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398 (1999), and *Scaccia* v. *State Ethics Comm'n*, 727 N.E.2d 824 (Mass. 2000), respectively.   *United States* v. *Woodward*, No. 99-11132, Memorandum and Order (D. Mass. Feb. 9, 2001).

In the original and the amended judgments of conviction, I sentenced Woodward to 6 months of community confinement, 2 years of supervised release, a $5,000 fine, and a $100 special

-4-

assessment.

In November 2002, the Massachusetts State Board of Retirement rescinded Woodward's retirement benefits under the pension forfeiture provision of Mass. Gen. Laws ch. 32, § 15(4). That provision states: "In no event shall any member after final conviction of a criminal offense involving violation of the laws applicable to his office or position, be entitled to receive a retirement allowance . . . ." *Id.* Woodward was, however, entitled to recover his contributions to the pension plan, without interest. *Id.* The Supreme Judicial Court of Massachusetts rejected Woodward's challenge that the forfeiture action was time-barred. *See generally State Bd. of Ret.* v. *Woodward*, 847 N.E.2d 298 (Mass. 2006).

## C. *Legal Developments*

This petition for coram nobis, filed in February 2012, was spurred by the Supreme Court's decision in *Skilling* v. *United States*, 130 S. Ct. 2896 (2010), which significantly narrowed the honest services theory of mail and wire fraud. To avoid constitutional vagueness concerns, *Skilling* limited honest services fraud to its "core meaning" of "schemes to defraud involving bribes and kickbacks." *Skilling*, 130 S. Ct. at 2907; *id.* at 2929-31. In doing so, the Court rejected the "undisclosed self-dealing" theory of honest services fraud, which it described as "the taking of official action by the employee that furthers

his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932.

At the time of Woodward's conviction, by contrast, the government was not required to allege or prove a quid pro quo to establish honest services fraud.  Rather, honest services fraud was understood to occur in two ways: "(1) the official can be influenced or otherwise improperly affected in the performance of his duties; or (2) the official can fail to disclose a conflict of interest." *Woodward*, 149 F.3d at 57.

Accordingly, the indictment in this case charged generally that Woodward "knowingly and willfully devised and executed a scheme and artifice to defraud the Commonwealth of Massachusetts and its citizens of their right to . . . honest services."  Among the alleged means employed, many related to undisclosed conflicts of interest, but the indictment also charged that Woodward accepted "travel, lodging, golf, meals, tickets and other entertainment and benefits, in violation of his duty of honest services."

Woodward's petition argues that he was convicted on theories of honest services rejected by *Skilling*: (1) "an expanded definition of bribery that did not involve a bribe, kickback, or quid pro quo," and (2) an undisclosed self-dealing theory.  Even if the indictment adequately charged quid pro quo bribery,

Woodward contends, the undisclosed self-dealing theory was nevertheless presented to the jury.  Woodward thus invokes the rule applied on direct appeal that "where a general verdict may rest on a ground that is invalid because the theory of conviction is contrary to law--as opposed to a ground that is invalid because the evidence supporting it is insufficient as a matter of law--the verdict must be set aside despite the existence of an alternate, legally valid ground of conviction."  *United States* v. *Richardson*, 421 F.3d 17, 31 (1st Cir. 2005).  Approached from any angle, according to Woodward, his conviction was based on fundamental errors that warrant relief.

## II. CORAM NOBIS

The All Writs Act, 28 U.S.C. § 1651(a), empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  One such writ, that of coram nobis, has recently received thorough attention from the First Circuit in an analysis of its history, purposes, and standards.  *See United States* v. *George*, 676 F.3d 249(1st Cir. 2012).

Coram nobis is "a remedy of last resort for the correction of fundamental errors of fact or law."  *United States* v. *George*, 676 F.3d 249, 253 (1st Cir. 2012) (citing *Trenkler* v. *United States*, 536 F.3d 85, 93 (1st Cir. 2008)).  It is "ordinarily available only to a criminal defendant who is no longer in

custody." *Trenkler*, 536 F.3d at 98.  Woodward is no longer in custody.

The First Circuit has developed a tripartite test of eligibility for the writ:

> a coram nobis petitioner must [1] explain his failure to seek earlier relief from the judgment, [2] show that he continues to suffer significant collateral consequences from the judgment, and [3] demonstrate that the judgment resulted from an error of the most fundamental character.

*George*, 676 F.3d at 254.  Although I find that Woodward can satisfy neither the first nor the third prong of the test, I will discuss each element below.

Moreover, the writ is an "extraordinary" remedy and "[a]n emphasis on restraint is ingrained," with the purpose of, among other things, protecting the finality of judgments. *George*, 676 F.3d at 253; *id.* at 258 (citing *United States* v. *Denedo*, 556 U.S. 904, 911, 916 (2009) ("judgment finality is not to be lightly cast aside" and coram nobis must be limited so that "finality is not at risk in a great number of cases")).  To that end, "[e]ven if the [tripartite] test is satisfied, the court retains discretion over the ultimate decision to grant or deny the writ." *Id.* at 255.  The broad but fundamental principle guiding the court's discretion is justice.  "The bottom line is that a writ of error coram nobis should issue 'only under circumstances compelling such action to achieve justice.'" *George*, 676 F.3d at 255 (quoting *United States* v. *Morgan*, 346 U.S. 502, 511 (1954)).

Ultimately, I conclude in my discretion that it is not necessary to issue a writ to achieve justice in Woodward's case.

### III. ANALYSIS

#### A.  *Failure to Seek Relief Earlier*

The government does not seriously contest that *Skilling* reflects a theory pursuant to which Woodward earlier sought relief.  To the contrary, prior to *Skilling*, Woodward pursued every opportunity to challenge his conviction, on grounds later endorsed by *Skilling*, including post-judgment motions, direct appeal, and collateral challenge under § 2255.  That *Skilling* subsequently made the grounds firm justifies revival of these grounds in *Skilling*'s wake.

But I find that Woodward nevertheless failed to seek relief in a timely fashion.  *Skilling* was handed down by the Supreme Court on June 24, 2010, and Woodward did not submit his petition for coram nobis until more than 20 months later.  Given that his petition was based on a supervening legal development, I am of the view that it was unreasonable to file the petition later than a year after the refinements provided by the Supreme Court were announced.

While there is no formal statute of limitation for filing a writ of coram nobis, *see Telink, Inc.* v. *United States*, 24 F.3d 42, 45 (9th Cir. 1994), the one-year limitation period applicable to a writ of habeas corpus seeking to vacate a sentence under 28

U.S.C. § 2255 provides, by analogy, a serviceable benchmark for
what is reasonable under the circumstances.  *See* 28 U.S.C.
§ 2255(f)(3) (limitation period one year after "the date on which
the constitutional right asserted was initially recognized by the
Supreme Court, if that right has been newly recognized by the
Supreme Court and made retroactively applicable to cases on
collateral review.").[1]  Section 2255(f)(3) suggests that no more
than a year from the announcement of a new rule is required, even
if that new rule is constitutional in dimension, for a petitioner
of reasonable diligence to request relief based on that new rule.

I see nothing to justify extending the time period for

---

[1]*Skilling* did not specify whether its holding applied
retroactively on collateral review.  However, the Supreme Court's
last opinion limiting the substantive scope of honest services
fraud, *McNally* v. *United States*, 483 U.S. 350 (1987), was
understood to be fully retroactive.  *See United States* v.
*Mitchell*, 867 F.2d 1232, 1233 (9th Cir. 1989);  *United States* v.
*Shelton*, 848 F.2d 1485, 1488-90 (10th Cir. 1988) (en banc);
*Ingber* v. *Enzor*, 841 F.2d 450, 453-54 (2d Cir. 1988).  The
government has, in other cases, conceded that *Skilling* is fully
retroactive.  *E.g.*, *Martignoni* v. *United States*, No. 92 CR. 1097
JFK, 2011 WL 4834217, at *10 (S.D.N.Y. Oct. 12, 2011).  Most,
although not all, courts agree that *Skilling* is fully
retroactive.  *Compare United States* v. *Tehin*, No. CR 03-00236 SI,
2012 WL 3638543, at *7 (N.D. Cal. Aug. 22, 2012), *Colino* v.
*United States*, No. SACV 11-0904 DOC, 2012 WL 1198446, at *10
(C.D. Cal. Apr. 9, 2012), and *Rodrigues* v. *United States*, No. CV
10-00406 DAE-KSC, 2011 WL 529158, at *8 (D. Haw. Jan. 31, 2011)
(*Skilling* fully retroactive), *with United States* v. *Crawley*, No.
CRIM.A. H-06-204, 2010 WL 4393970, at *10 n.7 (S.D. Tex. Oct. 29,
2010) (*Skilling* not retroactive), *and DeGuzman* v. *United States*,
No. SA-10-CA-951-XR, 2010 WL 5889888 (W.D. Tex. Dec. 20, 2010)
(following *Crawley*).  In any event, I note the obvious that
§ 2255 merely provides a point of comparison by analogy and does
not directly limit the availability of coram nobis on timeliness
grounds.

filing the extraordinary writ of coram nobis beyond that for the garden variety writ of habeas corpus under these circumstances. *Skilling* was a well-anticipated and well-publicized decision of the Supreme Court.  No more than a year should have been necessary for Woodward to revive the proto-*Skilling* arguments he made early in his case.  I note in this connection that, in *George*, the petition for a writ of coram nobis was filed less than six months after *Skilling* was handed down.  *See George*, 824 F. Supp. 2d at 218.  *Cf. also United States* v. *Njai*, 312 F. App'x 953, 954 (9th Cir. 2009) (although not specifically invoking one-year limitation, denying coram nobis petition where decision allegedly providing grounds for relief was decided in April 2004 and petition was not filed until August 2006).

Consequently, I find Woodward does not meet the timeliness test for a coram nobis petition.

## B.   *Collateral Consequences*

Woodward argues that, in addition to the stigma attached to any criminal conviction, the loss of his pension benefits constitutes a significant collateral consequence from his conviction.  Having contributed to the state pension fund for 18 years, Woodward was entitled to a defined benefit monthly pension of $1,757.34 per month, health insurance for himself and his wife, and a $5,000 life insurance policy.  Without those benefits, Woodward says he and his wife paid $5,390.40 annually

for health and dental insurance from 2003 to 2009, and have paid $496.00 per month ($5,952.00 annually) since then.  Whether loss of pension benefits constitutes a significant continuing collateral consequence is an open question in this circuit. *George*, 256 F.3d at 256 n.3.

The petitioner in *George* also relied upon the loss of his monthly pension benefits to establish collateral consequences. The district court denied the writ on the grounds that petitioner's loss of benefits not only failed to constitute a *continuing* collateral consequence, but also was not sufficiently *significant*.  *United States* v. *George*, 824 F. Supp. 2d 217 (D. Mass. 2011).  The district court, drawing on the Seventh Circuit's opinion in *United States* v. *Craig*, 907 F.2d 653 (7th Cir. 1990), characterized the loss of pension benefits as having "occurred entirely in the past" and as "a sunk cost, much like a criminal fine." *George*, 824 F. Supp. 2d at 220 (quoting *Craig*, 907 F.2d at 660).  The district court went on to conclude that such "financial obligations resulting from a conviction are not significant enough to warrant *coram nobis* relief." *George*, 824 F. Supp. 2d at 221.

The First Circuit affirmed, but assumed the collateral consequences requirement was satisfied and instead rooted its denial of the writ in general considerations of justice.  *George*, 256 F.3d at 256 & n.3.  That said, the court did clarify one

-12-

additional aspect of the collateral consequences requirement: "it must be shown that the court's decree will eliminate the claimed collateral consequence and bring about the relief sought." *George*, 256 F.3d at 256 n.3.  Although not technically relying on this aspect for its decision, the court observed that "[t]he record here offers no compelling reason to believe that vacating the petitioner's conviction would automatically restore his retirement benefits."  *Id.*

I also need not decide the issue because I will deny the writ on other grounds.  But, I do wish to register my reservations regarding peremptory rejection of the argument that loss of defined future benefits may constitute a significant continuing collateral consequence.  To be sure, "[c]riminal convictions sometimes produce financial penalties . . . but these do not entail continuing legal effects of a judgment." *United States* v. *Keane*, 852 F.2d 199, 203 (7th Cir. 1988).[2]  Defined

---

[2]*Keane* reflects a reluctance among courts to treat *any* financial penalties as justification for granting coram nobis. *See, e.g.*, *United States* v. *Sloan*, 505 F.3d 685, 697 (7th Cir. 2007); *United States* v. *Craig*, 907 F.2d 653, 658-60 (7th Cir. 1990); *United States* v. *Iacoboni*, 592 F. Supp. 2d 216, 221 (D. Mass. 2009) (citing *Sloan*, 505 F.3d at 697).  But such a categorical approach strikes me as contrary to the flexible nature of the writ.  I would reserve the possibility of a financial penalty so severe, relative to a petitioner's financial position, that it could constitute a sufficiently "significant" collateral consequence to justify granting the writ.  In any event, the continued deprivation of otherwise promised future pension benefits, which is the essence of the defined benefit approach, does not fit comfortably into a categorical approach setting a disabling bar of "significance" for other financial penalties.

benefit pensions are different from other financial penalties,
like fines, because they involve ongoing monthly payments and
their ultimate value varies based on a recipient's lifespan.  In
this sense, the defined benefit pension may be distinguished from
financial penalties or restitution--the value of which are
effectively set when a conviction becomes final, a point entirely
in the past.  Spreading a fixed financial penalty like
restitution over time does not transform that penalty into a
*continuing* collateral consequence.  *Cf.  United States* v.
*Iacaboni*, 592 F. Supp. 2d 216, 221 (D. Mass. 2009) (holding that
an "ongoing financial requirement, such as Defendant's monthly
payment obligation here," in form of wage garnishment, is not
significant continuing collateral consequence) (citing *United
States* v. *Sloan*, 505 F.3d 685, 697 (7th Cir. 2007)).  But it may
do so for a bundle of benefits which would otherwise continue for
life absent a disabling conviction.  It is no complete answer to
the continuing character of the disability that the contributions
were returned and that the returned funds could be annuitized
where, as here, the annuity could not begin to approximate the
uncertain but plainly considerable continuing value of the
defined benefit.

The First Circuit's concern that granting the writ would not
necessarily provide on pension grounds the relief Woodward seeks
also remains unresolved.  The Supreme Judicial Court held, in

-14-

Woodward's own case, that "forfeiture under § 15(4) is mandatory and occurs by operation of law" and "is an automatic legal consequence of conviction of certain offenses." *Woodward*, 847 N.E.2d at 306.  But the SJC does not instruct whether reinstatement--presumably through a motion for relief from judgment under Mass. R. Civ. P. 60(b)(5) or 60(b)(6)--would also be automatic.  Woodward has cited, and I have found, no controlling authority on this point.

The issue presents a potential Catch-22: ask a federal court for coram nobis and lose for want of confirmation that state benefits will be reinstated; ask a state court to reinstate benefits and lose based on a current federal criminal conviction. If it were determinative of the outcome of the case, I would be inclined to certify a question to the Supreme Judicial Court inquiring whether Woodward's benefits would be reinstated upon vacation of his current conviction.  But that step is unwarranted here because Woodward cannot satisfy either the first or third prongs of the necessary, albeit not categorically sufficient, tripartite test used by the First Circuit to measure justification for a writ of coram nobis.

## C.   *Fundamental Error & Demands of Justice*

Woodward says the government "does not challenge that the judgment against Petitioner resulted from a fundamental error." The government never goes precisely that far.  It does, however,

-15-

contend that even if there was a fundamental error, Woodward is not entitled to relief.

The semantics are an unnecessary distraction because the analyses of fundamental error and the demands of justice are in some measure coextensive.  Relevant to both inquiries is whether the record of conviction supports quid pro quo bribery, as required by *Skilling*.  Whether the error is fundamental might also take into account whether the government *would* have been able to prove quid pro quo bribery if it had been required to do so at the time.  *Cf. George*, 676 F.3d at 254, 257.  Probing the demands of justice then turns to more general questions about "the wrongfulness or the criminal character" of Woodward's actions-- taking into account other federal or even state criminal statutes Woodward might have violated.  *See George*, 676 F.3d at 259.

In some respects, the evidence of quid pro quo bribery in this case is thin.  The amount of money involved is relatively modest and the nature of the activities relatively innocuous; one would imagine exacting a higher price for votes than greens fees and Gibsons.  As the First Circuit observed, the conduct in this case "may not be very different, except possibly in degree, from the kind of routine cultivation of friendship in a lobbying context that, while arguably very unattractive, is not 'bribery,'" even in a pre-*Skilling* world.  *Sawyer*, 85 F.3d at 741.  And, weighing in Woodward's favor is the fact that he fought his

-16-

convictions to the bitter end.  *Cf. George*, 676 F.3d at 254
(noting that some courts weigh "whether the petitioner had
exhausted his rights to appeal").

That said, Woodward misleadingly argues the government
conceded that it could not--or at least did not--prove quid pro
quo bribery.  The concession at issue was made in the course of
Woodward's collateral attack under § 2255 but was much more narrow
that Woodward suggests.  The government merely admitted that it
could not show a link between any benefit conferred by Sawyer and
a *specific* official act by Woodward, as required to show an
illegal *gratuity* under the Travel Act.  *Sun-Diamond*, 526 U.S. 398.

*Bribery*, however, is generally understood to require a less
specific connection to official duties upon a more specific
showing of a quid pro quo.  In that respect, courts since *Skilling*
have held that "bribery can be accomplished through an ongoing
course of conduct, so long as evidence shows that the favors and
gifts flowing to a public official [are] *in exchange for* a pattern
of official actions favorable to the donor."  *United States* v.
*Bahel*, 662 F.3d 610, 635 (2d Cir. 2011) (emphasis in original,
internal citations omitted); *accord United States* v. *Bryant*, 655
F.3d 232, 241 (3d Cir. 2011) ("It is enough for the [G]overnment
to present evidence that shows a course of conduct of favors and
gifts flowing to a public official in exchange for a pattern of
official actions favorable to the donor.") (modification in

-17-

original, internal citations omitted).

A reasonable jury could have concluded that the facts in this case met such a definition of bribery.  The asymmetrical expressions of "friendship" between Woodward and Sawyer corresponded precisely to the time when Woodward was in a position to, and did, take more favorable action for Hancock and the life insurance industry than any prior Insurance Committee Chair.

Woodward's failure to disclose the gratuities also adds modest support to an inference of a quid pro quo, but more importantly provides an independent basis for denying coram nobis that is rooted entirely in considerations of justice.  The failure to disclose was not only, in Woodward's own words, "reprehensible," but also independently criminal under Mass. Gen. Laws Ann. ch. 268B, § 7.  Even if Woodward were correct that his actions do not constitute a federal offense under *Skilling*, and that the potential criminal implications under federal law were unclear to him at the time of his conduct, the possibility of criminal sanctions--and thus the disqualification for his pension--was always clear under state law.  Moreover, the failure to disclose was a "clear violation of his obligations under the oath taken by him as an official of the Massachusetts [legislature]," which may alone support the notion that justice does not compel the "extraordinary balm of coram nobis relief." *George*, 676 F.3d at 255, 259.

The cases Woodward cites in which district courts have granted coram nobis relief in light of *Skilling* are distinguishable in various respects. *Martignoni* v. *United States*, Nos. 92-cr-1097, 10-civ-6671, 2011 WL 4834217 (S.D.N.Y. Oct. 12, 2011), for example, involved a petitioner convicted of honest services fraud for falsification of bank records solely for personal gain--conduct not even remotely close to taking a bribe or kickback. Moreover, that case involved the undisputedly significant collateral consequence of deportation.

*United States* v. *Panarella*, No. 00-655, 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011), and *United States* v. *Lynch*, 807 F. Supp. 2d 224, 227 (E.D. Pa. 2011), are in some ways more closely on point. But those cases reflect the variations in approaching coram nobis among circuits. *Panarella* and *Lynch* both involved guilty pleas and convictions based solely on the theory of undisclosed conflict of interest; the fundamental error of being convicted for conduct that is not a crime thus warranted coram nobis relief. *Panarella*, 2011 WL 3273599, at *4; *Lynch*, 807 F. Supp. 2d at 234-35. The sense of being bound by the indictment and the plea reflects that these courts, unlike the First Circuit, treat coram nobis as equivalent to other more traditional forms of collateral review, like habeas corpus.

*George* paints a very different picture, making clear that coram nobis sets an even higher bar than other forms of collateral

review; this extraordinary writ sits at the "far end" of the continuum of options for post-conviction relief. *George*, 676 F.3d at 258. Unlike the district courts in *Panarella* and *Lynch*, the First Circuit explicitly held against the defendant his strategic decision to plead guilty, which may have stifled the development of a record that would have demonstrated criminal bribery even under *Skilling*. *See George*, 676 F.3d at 258. The formalist, technical approach to fundamental error in *Panarella* and *Lynch* also stands in stark contrast to the First Circuit's guidance that in "uncertain circumstances, a *Skilling* error cannot readily be classified as an error of the most fundamental character." *George*, 676 F.3d at 258. And, perhaps most importantly, neither *Panarella* nor *Lynch* weighed general considerations of justice in deciding whether to grant relief, as *George* instructs me to do.

## D.  Conclusion

Woodward belatedly petitions this court, on the basis of collateral consequences that may otherwise warrant relief, to ignore conduct that is arguably criminal under federal law even after *Skilling*, indisputably criminal under state law, and simply reprehensible, to use the defendant's own desicription, by any standard. Coram nobis is not a means to allow a petitioner to expunge a conviction in such circumstances well after the statute of limitations has run. Woodward has not justified deviating from the otherwise paramount interest in finality of judgments, and

-20-

justice does not compel re-opening to Woodward the opportunity to recover benefits from the public he disserved for nearly six years.  I see no reason to exercise my discretion to vacate the conviction in this case.

### IV. CONCLUSION

For the reasons set forth more fully above, the petition for writ of error coram nobis (Dkt. No. 200) is DENIED, and the Clerk is directed to dismiss this matter.

*Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE