UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
          Respondent,            )
                                 )    CRIMINAL NO.
     v.                          )    95-10234-DPW
                                 )
FRANCIS H. WOODWARD,             )    CIVIL ACTION NO.
                                 )    17-12036-DPW
          Petitioner.            )

MEMORANDUM AND ORDER
October 18, 2017

Francis H. Woodward has filed another petition for a writ of error *coram nobis* pursuant to the All Writs Act, 28 U.S.C. § 1651, seeking to vacate and expunge his convictions for honest services mail and wire fraud committed while he was in a leadership position in the Massachusetts House of Representatives.

I denied Woodward's first *coram nobis* petition on October 10, 2012, finding that the demands of justice did not justify relief. *United States* v. *Woodward*, No. CIV.A. 12-11431-DPW, 2012 WL 4856055, at *9 (D. Mass. Oct. 10, 2012). Woodward bases this second petition primarily on the Supreme Court's subsequent decision in *McDonnell* v. *United States*, 136 S. Ct. 2355 (2016).

While acknowledging the narrowing legal grounds upon which his convictions stand, I again find that the demands of justice do not justify relief.

*A.    Facts*

Woodward was elected to the Massachusetts House of Representatives in 1977 and served as the House Chair of the Joint Committee on Insurance from January 1985 to January 1991. During the same period, William Sawyer worked as the senior legislative counsel for John Hancock Mutual Life Insurance Company, one of the two largest life insurance companies in Massachusetts, and participated, along with Hancock, in the Life Insurance Association of Massachusetts ("LIAM"), an industry trade association. Sawyer was "frequently present at Insurance Committee meetings" and was "the lobbyist who met most often with Woodward." *United States* v. *Woodward*, 149 F.3d 46, 52 (1st Cir. 1998).

From 1984 to 1992, Woodward received $8,740 worth of gratuities from Sawyer, including meals, rounds of golf, travel expenses, and other entertainment. A year-by-year breakdown of the gratuities reveals what I previously described as a "suspicious pattern." *Woodward*, 2012 WL 4856055, at *1. As the First Circuit recounted in rejecting Woodward's direct appeal from his convictions:

> In 1984 and 1985, before Woodward became chair of the Committee and for the first year afterward, Woodward accepted gratuities in the range of $200-300 from Sawyer/Hancock. In 1986 there was a marked increase to $2,527, including over $1,800 to cover the air fare, hotel,

and tickets (for him and his wife) to attend the Super Bowl
in New Orleans.  In 1987-91, Woodward received gratuities
in the amount of $1,547, $1,093, $513, $1,230, and $1,324.
Woodward served as committee chair during all but the last
of these years.  During his last four months in the
legislature, January through April 1992, he received only
$16, and his gratuities dropped to $0 after he resigned
from office in April.  After Woodward was replaced as
committee chair by Rep. Francis Mara, Sawyer began wining
and dining Mara in the same manner as he had Woodward.

*Woodward*, 149 F.3d at 53.

In the years Woodward received these gratuities, he made
decisions within the Insurance Committee that served the
interests of Sawyer and Hancock.  During the six years he served
as co-chair, the committee considered approximately six hundred
bills of interest to the life insurance industry.  Woodward
opposed the insurance industry's position on only thirty-one of
those bills.  And of those thirty-one bills, only three related
to life insurance, the industry of particular importance to
Hancock.

Under Massachusetts law, Woodward had a duty to file a
Statement of Financial Interests with the Massachusetts State
Ethics Commission each year that disclosed "all gifts he or his
immediate family received, aggregating more than $100 per year,
from lobbyists or businesses that had a direct interest in
legislation." *Woodward*, 149 F.3d at 62 (citing Mass. Gen. Laws
ch. 268B, § 5).  Woodward did not disclose in required filings

any of the gratuities he received from Sawyer.  He signed those

statements under oath subject to penalties for perjury.

**B.    *Procedural History***

<u>1.    The Prosecution</u>

After his indictment in July 1995, Woodward was convicted

following trial in this court in October 1996 of: one count of

mail fraud under 18 U.S.C. § 1341 (Count 4); one count of wire

fraud under 18 U.S.C. § 1343 (Count 9); two counts of interstate

travel to commit bribery under the Travel Act, 18 U.S.C. § 1952

(Counts 14 and 24); and one count of conspiracy to commit these

offenses under 18 U.S.C. § 371 (Count 1).  Following the verdict,

I granted judgment of acquittal on one (Count 24) of the Travel

Act counts as duplicitous.  On February 7, 1997, I sentenced

Woodward to six months in a halfway house, supervised release of

two years, and a $200 special assessment.  The First Circuit

affirmed.  *Woodward*, 149 F.3d at 73.

<u>2.    Collateral Attack Under 28 U.S.C. § 2255</u>

After Woodward's direct appeal was decided but before

execution of his sentence began, in response to collateral

attack under 28 U.S.C. § 2255, I vacated the convictions on

Count 1 and Count 14 and ordered those counts dismissed in light

of intervening interpretations of the federal and state gratuity

statutes in *United States* v. *Sun-Diamond Growers of California*,

526 U.S. 398 (1999) and *Scaccia* v. *State Ethics Commission*, 727

4

N.E.2d 824 (Mass. 2000). *United States* v. *Woodward*, Civil Action No. 99-11132-DPW (D. Mass. Feb. 9, 2001). I then resentenced Woodward on February 12, 2001 to six months of community confinement, two years of supervised release, a $5,000 fine, and a $100 special assessment. By order dated April 19, 2001, on the joint recommendation of the parties, I amended the judicial recommendation to provide for home confinement, rather than community confinement.

### 3. The Pension Consequence

On November 21, 2002, the Massachusetts State Board of Retirement rescinded Woodward's pension benefits pursuant to Massachusetts General Laws ch. 32 § 15(4), which provides that "[i]n no event shall any member after final conviction of a criminal offense involving violation of the laws applicable to his office or position, be entitled to receive a retirement allowance." The Supreme Judicial Court upheld the board's action against a challenge that it was time-barred. *State Bd. of Retirement* v. *Woodward*, 847 N.E.2d 298, 306 (Mass. 2006).

### 4. Initial Collateral Attack by Petition for *Coram Nobis*

Woodward filed his first petition for *coram nobis* relief in this court in February 2012. *Woodward*, 2012 WL 4856055, at *2. He argued, *id.* at *3, that his remaining convictions rested on legal theories rejected by the Supreme Court in *Skilling* v. *United States*, 561 U.S. 358 (2010).

Using the conventional three-part test for *coram nobis*

relief to frame my analysis, I concluded Woodward could not

satisfy two of the test's three prongs. *Id.* at *4. As to the

first prong, I concluded Woodward's petition was untimely

because it was filed more than twenty months after *Skilling* was

decided, a delay I found to be unreasonable. *Id.* at *5. As to

the third prong, I concluded that even after *Skilling*, a

reasonable jury still could have concluded that Woodward's

actions constituted bribery. *Id.* at *7-8. Moreover, I found

that Woodward's violations of state disclosure requirements

provided "an independent basis for denying *coram nobis* that is

rooted entirely in considerations of justice." *Id.* at *8.

### 5. Further Legal Developments

#### a. McDonnell

Woodward's current petition rests primarily on the Supreme

Court's subsequent decision in *McDonnell* v. *United States*, 136

S. Ct. 2355 (2016). In *McDonnell*, the court reviewed former

Virginia Governor Robert McDonnell's conviction for bribery.

136 S. Ct. at 2361. Governor McDonnell and his wife received

$175,000 in loans and gifts from a Virginia businessman, Jonnie

Williams, and in exchange, Governor McDonnell allegedly

performed various tasks and favors to promote Williams'

business. *Id.*

Under relevant bribery law, the government was required to show that "Governor McDonnell committed or agreed to commit an 'official act' in exchange for the loans and gifts from Williams." *Id.* at 2365. The indictment charged Governor McDonnell with committing at least five "official acts," including "arranging meetings for [Williams] with Virginia government officials" and "hosting, and . . . attending, events at the Governor's Mansion" that were designed to promote Williams' business. *Id.* At trial, the judge instructed the jury that an "official act" could include acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id.* at 2366.

The Supreme Court vacated Governor McDonnell's conviction. *Id.* at 2375. In so doing, the court adopted "a more bounded interpretation of 'official act,'" and found that "[u]nder that interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id.* at 2368. The court read the text of the federal bribery statute, which the parties agreed provided the appropriate measure, *id.* at 2365, to impose two requirements for an "official act":

> First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or may by law be brought before a public official. Second, the Government must prove that the public official made a decision or took an action 'on' that

question, matter, cause, suit, proceeding, or controversy,
or agreed to do so.

*Id.* at 2368.

The court stated that the words "'cause,' 'suit,'
'proceeding' and 'controversy' . . . connote a formal exercise
of governmental power, such as a lawsuit, hearing, or
administrative determination." *Id.* Although the court
recognized that the words "question" and "matter" could be read
quite broadly, the court determined that, based on their
context, they "must be similar in nature to a 'cause, suit,
proceeding or controversy.'" *Id*. at 2369. The court therefore
concluded that a question, matter, cause, suit, proceeding, or
controversy "must involve a formal exercise of governmental
power that is similar in nature to a lawsuit before a court, a
determination before an agency, or a hearing before a committee"
and that merely "[s]etting up a meeting, talking to another
official, or organizing an event (or agreeing to do so)" does
not alone qualify as an "official act." *Id.* at 2372.

The court held that the jury instructions offered at trial
on the meaning of "official act" were inadequate. *Id.* at 2375.
The court concluded the jury may not have relied on the properly
narrowed definition of "official act" and may have instead
believed that a typical meeting, call, or event about "something
as nebulous as 'Virginia business and economic development'"

8

could have constituted an "official act." *Id.* at 2374.

According to the court, the trial judge should have instructed

the jury that "it must identify a 'question, matter, cause,

suit, proceeding or controversy' involving the formal exercise

of governmental power," and it must find the defendant "made a

decision or took an action—or agreed to do so—*on* the identified

'question, matter, cause, suit, proceeding or controversy.'"

*Id.* (emphasis in original).

        *b. Tavares*

Woodward also points to the First Circuit's decision in

*United States* v. *Tavares*, in which the court reviewed

convictions of several officials within the Massachusetts Office

of the Commissioner of Probation based on their roles in a

hiring scheme within the department. 844 F.3d 46, 49 (1st Cir.

2016). The government alleged that defendant John O'Brien gave

appointments within the department to Representative Robert

DeLeo and that DeLeo in turn "offered various legislators the

opportunity to appoint individuals for these positions in

exchange for their voting for DeLeo" for Speaker of the House.

*Id*. at 56. The government further alleged that O'Brien met with

DeLeo and proposed two methods by which O'Brien would have

greater power over appointments. *Id.* Relying on *McDonnell*, the

court found the conduct at issue did not constitute "official

acts" under the Massachusetts gratuity statute:

> All the Government demonstrated, however, is that O'Brien
> and DeLeo met.  The evidence does not show, for example,
> that DeLeo subsequently introduced a bill based on either
> of O'Brien's proposals or took some official act with
> respect to such a bill proposed by another legislator.  The
> Government also identifies no particular statements that
> O'Brien or DeLeo made about the proposals, or other
> evidence about that meeting, from which a jury might
> reasonably infer what specific official act, if any,
> O'Brien was trying to induce DeLeo to take.  *Id.* at 57.

The court found the evidence merely showed "that O'Brien was

seeking general legislative support from DeLeo," which was "not

sufficient to show a specific public act, and with it an illegal

gratuity."  *Id.* at 58.

## II. DISCUSSION

The First Circuit has recognized that "[p]ursuant to the

All Writs Act, federal courts have the authority to grant writs

that were traditionally available at common law." *United States*

v. *Sawyer*, 239 F.3d 31, 37 (1st Cir. 2001).  "[T]racing its

roots to sixteenth century English common law," the writ of

error *coram nobis* is "now available as a remedy of last resort

for the correction of fundamental errors of fact or law" in

federal criminal cases in which the criminal defendant is no

longer in custody.  *United States* v. *George*, 676 F.3d 249, 253

(1st Cir. 2012); *Trenkler* v. *United States*, 536 F.3d 85, 98 (1st

Cir. 2008).

The First Circuit has adopted a three-part test for

determining whether a petitioner is eligible for a writ.  A

petitioner must "explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character." *George*, 676 F.3d at 254. Even if the petitioner satisfies the test, "the court retains discretion over the ultimate decision to grant or deny the writ." *Id.* at 255. "The broad but fundamental principle guiding the court's discretion is justice." *Woodward*, 2012 WL 4856055, at *4. A court should issue the writ only if it concludes that such an action is necessary "'to achieve justice.'" *George*, 676 F.3d at 255 (quoting *United States* v. *Morgan*, 346 U.S. 502, 511 (1954)).

## A.   *Failure to Seek Relief Earlier*

The government does not contest that Woodward's petition is timely. The arguments underlying Woodward's current petition are, to be sure, variations on themes previously raised in his direct appeal and collateral challenges to his convictions. *See Woodward*, 2012 WL 4856055, at *4. However, they rest on developing case law. Woodward filed this petition approximately six months after the Supreme Court issued its decision in *McDonnell* and less than one month after the First Circuit issued its decision in *Tavares*. In denying Woodward's first petition, I looked to the one-year limitation period applicable to writs of habeas corpus as a "serviceable benchmark" for determining

11

the timeliness of petitions for *coram nobis* relief.  *Woodward*,

2012 WL 4856055, at *4.  Applying that benchmark to this

petition, I find Woodward's second petition is timely and the

new case law developments sufficiently explain his failure to

seek earlier relief from the judgment.

**B.    *Collateral Consequences***

Woodward contends, as he did in his first petition, that he

continues to suffer significant collateral consequences from his

conviction based on the loss of his state pension.[1]  The benefits

at issue remain largely unchanged from when he filed his first

petition in 2012:

> Having contributed to the state pension fund for 18 years,
> Woodward was entitled to a defined benefit monthly pension
> of $1,757.34 per month, health insurance for himself and
> his wife, and a $5,000 life insurance policy.  Without
> those benefits, Woodward says he and his wife paid
> $5,390.40 annually for health and dental insurance from
> 2003 to 2009, and have paid $496.00 per month ($5,952.00
> annually) since then.

---

[1] Woodward also asserts that he is haunted by his conviction and
continues to experience stigmatization based on his conviction.
He invites me to recognize, as other circuits have, that
criminal convictions inherently carry significant collateral
consequences.  *See, e.g.*, *United States* v. *Walgren*, 885 F.2d
1417, 1421 (9th Cir. 1989)("'We have repeatedly reaffirmed the
presumption that collateral consequences flow from any criminal
conviction,' and the government carries the burden of disproving
this presumption.") (quoting *Hirabayashi* v. *United States*, 828
F.2d 591, 606 (9th Cir. 1987)).  It remains the law of this
circuit, however, that "more than the mere fact of a conviction
is required" to show significant collateral consequences.
*George*, 676 F.3d at 256 n.2.  Woodward cannot rely solely on the
stigmatization that accompanies a criminal conviction to satisfy
this prong.

*Woodward*, 2012 WL 4856055, at \*5. Woodward notes in this connection that his healthcare costs have increased slightly since 2012.

When I denied Woodward's first petition, I left open the question whether the loss of a pension could qualify as a significant collateral consequence. *Id.* I observed that "[d]efined benefit pensions are different from other financial penalties, like fines, because they involve ongoing monthly payments and their ultimate value varies based on a recipient's lifespan." *Id.* at \*6. I found it was "no complete answer to the continuing character of the disability that the contributions were returned and that the returned funds could be annuitized where, as here, the annuity could not begin to approximate the uncertain but plainly considerable continuing value of the defined benefit." *Id.*

At that time, it also appeared unclear whether granting Woodward the writ would bring about the relief he sought. I noted that the Supreme Judicial Court had not decided whether his pension would automatically be reinstated, "presumably through a motion for relief from judgment under Mass. R. Civ. P. 60(b)(5) or 60(b)(6)," if he no longer was burdened with a criminal conviction. *Id.*

It remains an open question in the First Circuit whether the loss of pension benefits can qualify as a significant

collateral consequence.  In the time since I considered

Woodward's first petition, however, the Supreme Judicial Court

has provided additional insight regarding forfeiture of pensions

under Massachusetts General Laws ch. 32, § 15(4).  In *Public

Employee Retirement Administration Commission* v. *Bettencourt*,

the court held the complete forfeiture of a police officer's

retirement benefits violated the Excessive Fines Clause of the

Eighth Amendment.  47 N.E.3d 667, 683 (Mass. 2016).[2]  In its

Eighth Amendment analysis, the court noted that forfeiture

"cannot be imposed on an employee who is not convicted of

committing . . . an offense."  *Id.* at 677.  In this connection,

I observe that the Massachusetts Appeals Court had previously

found that forfeiture required a conviction for a qualifying

offense.  *Scully* v. *Retirement Bd. of Beverly*, 954 N.E.2d 541,

546 (Mass. App. Ct. 2011) ("[T]he mandatory forfeiture provision

is triggered only by a member's conviction and not by illegal

(or unsavory) conduct.").

---

[2] The court, nevertheless, did not announce a categorical rule
declaring all forfeitures of retirement benefits excessive.
*Bettencourt*, 47 N.E.3d at 683.  Rather, it examined the
circumstances of the particular officer's conviction and found
complete forfeiture was not proportional to the underlying
offense.  *Id.* at 678-81.  Recently, the Supreme Judicial Court
upheld the complete forfeiture of the pension of the former
Speaker of the Massachusetts House of Representatives against an
Eighth Amendment challenge, again demonstrating the fact-based
nature of the inquiry.  *State Bd. of Retirement* v. *Finneran*, 71
N.E.3d 1190, 1198-99 (Mass. 2017).

These cases indicate that if I were to grant *coram nobis* relief, Woodward's pension benefits would be reinstated. Vacating Woodward's conviction would appear to remove the only substantive obstacle between him and his pension benefits. The government for its part disagrees, asserting that his pension could still be denied on the grounds that his conduct was illegal under state law. But it is Woodward's conviction, not his conduct, that provides the basis for the premium forfeiture he currently suffers. *Id.* I will return to consider the criminality of his behavior under state law when I look to general considerations of the interests of justice. At this point, however, I conclude that if I were to issue the writ, it would "eliminate the claimed collateral consequence and bring about the relief sought." *George*, 676 F.3d at 256 n.3.

Because I find that the loss of a pension could constitute a significant collateral consequence and that vacation of Woodward's conviction would likely eliminate the grounds for that consequence, I will not deny relief on the basis of the second prong of *coram nobis* analysis.

## C.   *Fundamental Error and Demands of Justice*

Woodward argues his convictions for honest services mail and wire fraud are based on fundamental errors of law because the government failed to specify the "official acts," as defined

by *McDonnell*, that he performed on behalf of Sawyer and Hancock. I disagree.

As chair of the Insurance Committee, Woodward performed many official acts that served the interests of Sawyer and Hancock even under *McDonnell*'s more narrow definition. I find my jury instructions did not suffer from problems of overbreadth identified in *McDonnell*. A reasonable jury relying on my instructions and considering the evidence on the record before me could have convicted Woodward for engaging in "official acts" that met the requirements of *McDonnell*.

The government had to prove Woodward committed quid pro quo bribery within the statute of limitations period, meaning after July 27, 1990. *Woodward*, 149 F.3d at 52. Woodward left the Insurance Committee on January 19, 1991. *Id.* at 51.

A reasonable jury could have found that Woodward undertook "official acts" for the benefit of Sawyer and Hancock before July 27, 1990. The First Circuit recounted one such "official act" when it affirmed Woodward's conviction:

> [I]n each year from 1985 through 1990, the legislature considered a bill proposing mandatory discounts on life insurance for non-smokers. Hancock and LIAM opposed the bill. In 1989, the bill received favorable recommendation from the Insurance Committee based on support from Senator Linda Melconian, Woodward's co-chair of the Committee. But despite the Committee's favorable report, Woodward led the opposition to the bill in debate before the full House of Representatives, and was successful in defeating the so-called "non-smoker's bill" for that session. Hancock's

vice-president, who directly supervised Sawyer, called the
bill's defeat a "significant victory for the industry."

*Id.* at 60.

Leading the opposition to a major piece of legislation
plainly qualifies as an "official act" under *McDonnell*. 136 S.
Ct. at 2372. So too would the many instances where Woodward
"carried" pro-insurance bills through the legislative process
after they left the committee. *Woodward*, 149 F.3d at 60. The
First Circuit found that "the jury was entitled to believe . . .
that 'carrying' means actively guiding a bill through the
process; it is not merely ministerial." *Id.* at 61.

Unlike the defendant's conduct in *McDonnell*, which
consisted of informal meetings, calls, and events, Woodward's
active support of or opposition to bills on the floor of the
House of Representatives clearly involved the formal exercise of
governmental power. Moreover, the First Circuit in *Tavares*
identified "introduc[ing] a bill" or taking "some official act
with respect to such a bill proposed by another legislator" as
"official acts" even after *McDonnell*. 844 F.3d at 57.

In its affirmance of Woodward's conviction, the First
Circuit described conduct that a jury could find to be an
"official act" undertaken for Sawyer's benefit during the
statute of limitations period:

> As evidence of Woodward's post-gratuity activity, the
> government points to Woodward's action with respect to

S. 641, which proposed premium reductions in life
insurance for policyholders who were non-smokers. The
bill was originally reported favorably out of the
Insurance Committee on May 7, 1990. Then on July 24,
1990, just before becoming law, the House of
Representatives recommitted the bill to the Insurance
Committee. The effect of a bill's recommittal is that
both chairs would have to act in order for the bill to
be released. The bill languished in the Insurance
Committee with no further action taken through January
1, 1991, after Woodward received the Florida gratuities
and prior to his removal as co-chair. Woodward's co-
chair, Senator Melconian, had actively supported the
1989 bill by requesting a favorable recommendation from
the Insurance Committee. The jury could, therefore,
reasonably have inferred that Woodward prevented any
further action on S. 641, because in the previous year
he led the floor debate, on behalf of Hancock and LIAM,
against a similar non-smokers bill.

*Woodward*, 149 F.3d at 66. *Cf. United States* v. *Skelos*, Nos. 16-

1618-cr, 16-1697-cr, 2017 WL 4250021, at *4 (2d Cir. Sept. 26,

2017) ("Using one's influence as a high ranking state official

to push through county legislation . . . [is] indisputably [a]

formal exercise of government power constituting official acts

under *McDonnell.*").

Regardless, even after *McDonnell*, the government "need not

prove that an official act occurred within the statute of

limitations period." *United States* v. *Silver*, 864 F.3d 102, 122

(2d Cir. 2017). Rather, the government "need only prove that

some aspect of the particular *quid pro quo* scheme continued into

the statute of limitations period." *Id.*

Here, the record is clear that Woodward received benefits from Sawyer after July 27, 1990. The First Circuit discussed one example of benefits Sawyer bestowed on him in 1991:

> After entertaining Woodward for several days at the Scottsdale COIL conference in 1991, Sawyer left the conference early, but left his credit card to be used for paying Woodward's golf and meal expenses during the remainder of the conference. This is not consistent with mere friendship as the sole purpose of these payments, but rather is more consistent with the theory of a gratuity made because of Woodward's potential official actions.

*Woodward*, 149 F.3d at 58. The court also noted Woodward's receipt of "illegal gratuities" during a November 1990 conference in Orlando. *Id.* at 63-64.

Woodward contends the indictment included some conduct that would no longer qualify as "official acts." The indictment did charge Woodward with granting Sawyer "greater access to the Insurance Committee . . . than was available generally to citizens of the Commonwealth of Massachusetts." Granting greater access to the Insurance Committee is likely insufficient by itself to constitute an "official act" after *McDonnell*. However, Woodward's conduct did not end with granting access to the committee. His conduct included decisions on hundreds of bills over his years as chair of the Insurance Committee, decisions which overwhelmingly benefitted Sawyer and Hancock.

Relying on these official acts, a reasonable jury could have found Woodward committed quid pro quo bribery. As I noted

in the first petition, bribery "is generally understood to require a less specific connection to official duties upon a more specific showing of a quid pro quo." *Woodward*, 2012 WL 4856055, at *7. In the time since I considered his first petition, the First Circuit has similarly held that bribery "'can be accomplished through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official [are] *in exchange for* a pattern of official actions favorable to the donor.'" *United States* v. *McDonough*, 727 F.3d 143, 154 (1st Cir. 2013) (quoting *United States* v. *Ganim*, 510 F.3d 134, 149 (2d Cir. 2007)) (emphasis in original). I do not read *McDonnell* to alter this approach. *See* 136 S. Ct. at 2371 ("The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").[3]

---

[3] In a supplemental filing regarding this petition, Woodward relies on the Second Circuit's recent decision in *United States* v. *Silver*, 864 F.3d 102 (2d. Cir. 2017). In *Silver*, the court vacated the defendant's conviction for honest services fraud, extortion, and money laundering because it found the jury instructions defined "official act" too broadly in light of *McDonnell*. *Id*. at 106. Although the Second Circuit found the defendant had engaged in some conduct that would qualify as "official acts" after *McDonnell*, the court could not conclude "'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error'" in the jury instructions. *Id*. at 119 (quoting *United States* v. *Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016)).

*Silver* involved a direct appeal from a conviction. The government therefore faced a heavy burden in showing the asserted error in the jury instructions was harmless. Here,

Nor I do find my jury instructions fundamentally problematic, even after *McDonnell*. The definition of "official act" I provided to the jury explicitly invoked the formal exercise of governmental power. I instructed the jury as follows:

> An official act means any decision or action in the enactment of legislation. The Government doesn't have to show a specific link between a specific item of substantial value and a specific act to be done by the legislator. In other words, the Government does not have to show that there was an agreement requiring the legislator to perform certain specified official acts in exchange for the gratuity. The Government must prove either that the legislator accepted or received the gratuity with the intent to be influenced in the future performance of official duties or that the legislator was influenced in the performance of official duties by the intention that a gratuity would be received.

---

Woodward has already exhausted his options for direct appeal and now invokes the final remedy of *coram nobis*. "The further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment." *George*, 676 F.3d at 258.

It is true that, as in *Silver*, Woodward's conduct involves intermingled conduct, some of which would no longer qualify as "official acts" after *McDonnell*. But I would not need to vacate his conviction simply because I could not conclude beyond a reasonable doubt that a rational jury would have found him guilty using jury instructions formulated after *McDonnell*. Rather, I may vacate Woodward's conviction only if I find that justice demands it. As discussed above, because there is sufficient evidence from which a reasonable jury could have found him guilty even after *McDonnell* on the jury instructions I delivered, I find justice does not demand granting the writ. In the interest of completeness, however, I also note that I conclude beyond a reasonable doubt that a rational jury, guided more precisely by *McDonnell*, would have found Woodward guilty of the remaining charges.

Unlike the challenged instructions in *McDonnell*, which stated that an "official act" could include acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end," 136 S. Ct. at 2366, my instructions told the jury to focus only on decisions or actions made "in the enactment of legislation." Of course, because my instructions were issued twenty years before *McDonnell* was decided, the operative language in them is not perfectly congruent with *McDonnell*, but I nevertheless conclude that my definition of "official act" sufficiently captured the concerns later addressed in *McDonnell*.

Although I conclude a rational jury would have convicted Woodward of honest services fraud even as that offense has been narrowed over the last twenty years, I acknowledge the difficult questions raised by Woodward's petition in light of subsequent legal developments. The legal theories under which he was convicted have been pruned repeatedly by the Supreme Court in the years since he was convicted. *See, e.g.*, *McDonnell*, 136 S. Ct. at 2367-68; *Skilling*, 561 U.S. at 408-409; *Sun-Diamond*, 526 U.S. at 406-07. But I remain of the view that the record, and the instructions actually given in this case, continue to support the convictions from which Woodward seeks relief.

And when I return to broader considerations of justice, I again find a separate and reinforcing basis for denying relief.

Woodward has admitted he failed to disclose the gratuities from Sawyer. I relied on Woodward's failure to disclose in denying his first petition:

> The failure to disclose was not only, in Woodward's own words, "reprehensible," but also independently criminal under Mass. Gen. Laws Ann. ch. 268B, § 7. Even if Woodward were correct that his actions do not constitute a federal offense under *Skilling*, and that the potential criminal implications under federal law were unclear to him at the time of his conduct, the possibility of criminal sanctions-and thus the disqualification for his pension-was always clear under state law.

*Woodward*, 2012 WL 4856055, at *8.

I again find his failure to disclose violated "'his obligations under the oath taken by him as an official of the Massachusetts [legislature].'" This provides another ground upon which to deny relief. *Id.* (quoting *George*, 676 F.3d at 259).

Woodward knew, or should have known, it was wrong for him not to disclose the gifts he received from Sawyer. Even if Sawyer's gifts could be recharacterized as simply kind gestures of a generous friend and could be said to have had no impact on the decisions he made as the chair of the Insurance Committee, Woodward had a duty not only to the State Ethics Commission but also to the public to disclose them. Mass. Gen. Laws ch. 268B, § 3(d) (making "statements and reports filed with the commission available for public inspection and copying" upon request). Woodward's failure to disclose denied the State Ethics

Commission the ability to do its job effectively and denied the public the opportunity to decide for itself whether it was appropriate for him to carry on a close and financially advantageous friendship with a lobbyist from the industry he was tasked with regulating.

In *McDonnell*, the Supreme Court concluded the defendant's behavior was, at best, unseemly. 136 S. Ct. at 2375 ("There is no doubt that this case is distasteful; it may be worse than that."). But, facing a direct appeal from a federal criminal conviction, the court's concern was "not with tawdry tales of Ferraris, Rolexes, and ball gowns," but was "instead with the broader legal implications of the Government's boundless interpretations of the federal bribery statute." *Id.* The First Circuit made similar comments in reversing the convictions in *Tavares*, observing that "[a]lthough the actions of the defendants may well be judged distasteful, and even contrary to Massachusetts's personnel laws, the function of this Court is limited to determining whether they violated the federal criminal statutes charged." 844 F.3d at 49.

Tasked with deciding whether to sustain a second collateral attack on a conviction determined final after appellate review decades earlier, I have a somewhat different role. I must not lose sight of the overarching purposes of vindicating challenges to official corruption by engaging in *post hoc* recalibration of

wrongful and illegal behavior in order further to delineate the proper balance between state and federal power. Rather, my primary responsibility is to ensure that justice has been served. *George*, 676 F.3d at 259 ("In the end, the writ is designed to do justice, not to facilitate a miscarriage of justice."). I find the interests of justice do not justify the issuance of a writ of *coram nobis* relief to this petitioner.

### III. CONCLUSION

For the reasons set forth more fully above, the petition for writ of error *coram nobis* [Dkt. No. 212] is DENIED, and the Clerk is directed to dismiss this matter.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE